UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.,
ZIVAN SHACKELFORD,

    Plaintiff-Relator,

v.                                                                                          Case No. 02-73314

AMERICAN MANAGEMENT, INC.,                                   HONORABLE AVERN COHN
an Oklahoma corporation, ROBERT JOHNSON,
CHARLES JOHNSON, BARBARA GILL,
CLIFF's UNITED DEVELOPMENT, INC.,
a Michigan corporation, CLIFFORD SCOTT, and
WILLIAM HEARD,

    Defendants.

_____/

## MEMORANDUM AND ORDER
## GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT
## AND
## DENYING AMERICAN MANAGEMENT'S MOTION FOR SUMMARY JUDGMENT

I. Introduction

This is a case under the False Claims Act, 21 U.S.C. § 3729 generally asserting a scheme by defendants to defraud the Department of Housing and Urban Development (HUD). The case was originally filed by Zivan Shackelford as a qui tam action. The complaint was filed in camera and under seal. The government later filed its Notice of Election to Intervene under 31 U.S.C. § 3730(b)(2)(4). The defendants are: American Management, Inc. (AMI), Robert Johnson, Charles Johnson, Barbara Gill, Cliff's United Development, Inc., Clifford Scott, and William Heard.

Before the Court are cross motions for summary judgment by the government and AMI.  The motions present a single legal question - whether AMI is liable under the FCA for the acts of its former employees.  The motions were the subject of a hearing, after which the parties filed supplemental papers.  The matter is now ready for decision.  For the reasons that follow, the government's motion is GRANTED and AMI's motion is DENIED.

## II.  Background

The material facts are undisputed and the only issue which divides the parties is a question of law.  The parties filed a Stipulation as to Facts Not in Dispute which details the scheme to defraud HUD.  A brief recitation of the facts follows:

HUD hired AMI to manage the daily operations of HUD-owned properties in Michigan, Ohio, and other states.  AMI had employees on staff who performed services under its contracts with HUD; it was also allowed to subcontract out certain jobs by issuing purchase orders to outside contractors.  After AMI certified to HUD that the outside contractors performed the work in question, HUD paid the subcontractors directly.  AMI issued purchase orders to Clifford Scott, owner of Cliff's United Development, Inc. (Cliff's) and William Heard, owner of Heard's Home Repair (Heard's) for cleanup and repair services at several of the HUD-owned properties managed by AMI.

Barbara Gill was the District Manager for AMI, Charles Johnson was the Area Property Manager for AMI, and Robert Johnson was the Maintenance Supervisor for AMI.  The scheme is described in stipulated fact no. 11 as follows:

> Barbara Gill, Charles Johnson, and Robert Johnson entered into a

scheme to defraud the United States, or its agency, HUD, by awarding subcontracts for repairs and services at HUD-owned projects managed by AMI. The scheme called for Gill, Charles Johnson and Robert Johnson to facilitate the issuance of purchase orders for work that had been or would be performed by AMI employees whose payroll costs were already being paid for by HUD. Gill, Charles Johnson and Robert Johnson would locate subcontractors willing to participate in the scheme in exchange for a portion of the payments fraudulent obtained from HUD. Next, Charles Johnson and Gill would request AMI procurement personnel to approve the issuance of purchase orders for work which was supposedly going to be performed by the subcontractors in question. Thereafter, even though the subcontractors had not performed the work specified in the subcontractors, and even though AMI employees whose salaries were already being reimbursed by HUD actually performed some or all of the specified work, Johnson would certify completion of the work so that HUD would pay the subcontractors directly for performing the work. Then, after the participating subcontractors received payment from HUD, they would split the funds with the AMI employees who had orchestrated the scheme.

Cliff's and Heard were two such subcontractors who are alleged to have participated in the scheme. In total, the government identified nine bogus purchase orders issued by AMI for work to be performed by Cliff's or Heard, totaling $133,634.92.[1]

B.

As noted above, a qui tam complaint was filed under seal on August 14, 2002. It was not until almost three years later, on July 22, 2005, that the government notified its intent to intervene and the seal order was lifted. On October 24, 2005, the government filed a complaint against defendants. Thereafter, the government attempted service on all of the defendants. Clifford Scott and Cliff's were served and retained counsel, who filed an answer on their behalf on December 5, 2005. Heard was also served, is

---

[1] Despite the Court's inquiry at the hearing regarding the whereabouts of the purchase orders, they are not a part of the record.

proceeding pro se, and filed an answer on November 18, 2005.  AMI was served and retained counsel, who filed an answer on February 6, 2006.  Summons for Gill, Charles Johnson and Robert Johnson were returned as unexecuted.  The government thereafter obtained default judgments against them in the amount of $490,904.76, which represents three times the government's actual damages, plus $10,000 in civil penalties for each of the nine false claims (purchase orders) at issue.

Thereafter, AMI and the government filed cross motions for summary judgment.

### III.  Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and

significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

IV. Analysis

A. In General

The parties do not dispute that AMI employees presented false claims to the government in the form of the purchase orders for work allegedly performed by sub-contractors but in reality performed by AMI employees. The parties also do not dispute that AMI did not directly benefit from the actions of its employees. The parties do, however, dispute whether AMI is liable for the acts of its employees. This raises the question of vicarious liability under the FCA. As noted at the hearing, there is no clear precedent from the Sixth Circuit and as such, the Court is proceeding in "uncharted waters."

5

The FCA creates liability for any person who "(1) knowingly presents, or causes to be presented, to [the Government] ... a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a).  The FCA also provides that any person who causes a false claim to be submitted to the government is liable for a civil penalty of between $5,000 and $10,000 per claim plus three times the amount of actual damages.  See id. Importantly, section § 3729(b) provides:

> (b) Knowing and knowingly defined.--For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information--
> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information,
> and no proof of specific intent to defraud is required.

Although the government stresses that "no specific intent to defraud" is required, it is clear from a review of the statutory language that there is some degree of scienter required beyond mere negligence to trigger liability.  The question is therefore whether that scienter is attributable from an employee to an employer, without culpability on the employer's part.

The government argues that the fact that the AMI employees were acting within the scope of their employment establishes AMI's liability under the common law principles of respondeat superior and agency.  Both parties agree that there is a divergence of caselaw on the issue, none of which is from the Sixth Circuit.

B. The Precedents

In United States v. O'Connell, 890 F.2d 563 (1st Cir. 1989), the key case cited by the government, the Court of Appeals for the First Circuit found an employer vicariously liable under the FCA for the acts of its employee, a general manager and one-third owner, even though the acts of the employee did not benefit the corporation. The court first looked to cases imposing vicarious liability under anti-trust, securities, and RICO law. The First Circuit noted that in those cases it employed a two-step analysis: vicarious liability would apply unless (1) there was statutory language or (2) a statutory purpose precluded its imposition. Turning to the FCA, the court stated that "[t]here is nothing in the language of the [FCA] proscribing vicarious liability. The purposes of the [FCA] are to make the government whole (restitution) and to deter fraud against the government." 890 F.2d at 568.

Courts in other circuits have addressed the issue under the FCA, with varying results. Two cases arise out of the Firth Circuit. In United States v. Ridglea State Bank, 357 F.2d 495 (5th Cir. 1966), the primary case cited by AMI, the Court of Appeals for the Fifth Circuit distinguished vicarious liability for compensatory damages from liability for violations of criminal statutes. The court observed that while in the former cases, liability attached if the agent acted with apparent authority or within the scope of his/her employment. In the latter cases, liability attached only if the employee acted with the intent to benefit the employer. The court compared the FCA to a criminal statute because it served to punish the wrongdoer rather than simply compensate the government and therefore a case under the FCA was not "an ordinarily civil cases in which the intent of a self-serving employee is imputed to his employer." Id. at 498-99.

The court therefore refused to impose vicarious liability, concluding that "the knowledge of guilty intent of an agent will not be imputed to the employer, when the latter is sought to be held liable under a statute requiring knowledge or guilty intent." Id. Second, in United States v. Hangar One, Inc.,563 F.2d 1155, 1158 (5th Cir. 1977), the Fifth Circuit upheld vicarious liability under the FCA where a low-level employee acted within the scope of employment and for the purpose of benefitting the employer.

The Eleventh Circuit addressed the issue in Grand Union Co. v. United States, 696 F.2d 888, 890 -91 (11th Cir. 1983). The court held that the employee's knowledge would only be imputed to the employer if the employee acted within the scope of their employment and with the purpose of benefitting the employer. The dissent argued that the majority was wrongly utilizing a standard for ordinary civil cases and because the FCA was essentially penal in nature, the employee must have some knowledge of the employee's wrongful acts in order for vicarious liability to attach.

District courts have also considered the issue. In United States v. Incorporated Village of Island Park, 888 F. Supp. 419 (E.D.N.Y. 1995), the district court held that vicarious liability attaches if the employee acted either within the scope of employment and at least partially benefitted the employer.

In United States v. Southern Maryland Home Health Serv., Inc., 95 F. Supp. 2d 465 (D. Md. 2000), the district court concluded that neither the strict liability theory or the "benefit of the employer" theory were persuasive. Instead, the district court held that "at least when the recovery sought by the Government is substantially higher than its actual losses [i.e. treble damages], an employer is not vicariously liable under the FCA for wrongful acts undertaken by a non-managerial employee unless the employer had

knowledge of her acts, ratified them or was reckless in hiring or supervision of the employee." 95 F. Supp. 2d at 469. The district court first concluded that damages under the FCA were punitive in nature. Then, relying on case law holding that a principal is not vicariously liable for punitive damages stemming from an agent's misdeeds, the district court held that vicarious liability did not apply under the FCA.

In <u>United States ex rel Bryant v. Williams Building Co.</u>, 158 F. Supp. 2d 1001 (D. S. Da. 2001), the district court held that a principle is liable under the FCA for the acts of its agents committed within the scope of their employment or with apparent authority, "regardless of principle's knowledge, culpability, policies, or efforts to restrain the employee's bad acts." <u>Id</u>. at 1008.

There are also two Supreme Court cases that must to be considered, which have been cited in the cases discussed above. First, in <u>American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.</u>, 456 U.S. 556, 566-68 (1982), the Supreme Court considered the effect of the treble damages provision under the anti-trust statute on the doctrine of apparent authority. The Supreme Court concluded that an employee's wrongful acts would be imputed to the employer even though the employer had not knowledge of or did not ratify the employee's actions, based on the theory that the employee had the apparent authority to bind the employer. Second, in <u>Kolstad v. American Dental Ass'n</u>., 527 U.S. 526 (1999), the Supreme Court considered whether to hold, under Title VII, a corporate employer liable for punitive damages as a result of an employee's gender discrimination against another employee, when the employer did not know about, authorize, or ratify the illegal discrimination. The Supreme Court applied common law principles of agency, stating that "[t]he common law has long

9

recognized that agency principles limit vicarious liability for punitive awards[,].... a principle, moreover, that this Court historically has endorsed." Id. at 2127 (citations omitted). The Supreme Court then adopted the Restatement of Agency's "strict limitations" on the application of vicarious liability for punitive damages, which provide that liability may only be imputed to the principal if:

> 1) he authorized the wrongful act;
> 2) the agent was unfit and the principal was reckless in employing him;
> 3) the agent was acting in a managerial capacity and within the scope of his employment; or
> 4) the principal or a managerial agent ratified the wrongful acts.

See id. (quoting Restatement (Second) of Agency, § 217C); see also Restatement (Second) of Torts, § 909. In short, the Supreme Court rejected the theory that an employer is vicariously liable for punitive damages based solely on the employee's apparent authority or acts committed within the scope of her employment. Instead, the Supreme Court held that the employer must be culpable in some degree in order to have the employee's knowledge and acts imputed to it for punitive damage liability. See id. at 2129 ("[I]t is improper ordinarily to award punitive damages against one who himself is personally liable only vicariously.") (quotation omitted).

## C.  Application

From the above, the holdings in Ridglea Bank, Southern Maryland, and Kolstad support AMI's position that vicarious liability does not attach under the FCA unless the employer has some degree of knowledge of the employee's wrongful acts. The other decisions, which make up the majority, support the government's position that vicarious liability applies, regardless of the employer's knowledge. After careful consideration of the competing rationales, the Court concludes that the majority has the better view.

First, Ridglea Bank was decided under an earlier version of the FCA which required that a violation be committed "knowingly," a level of intent akin to that required in criminal law.  The court in Ridglea Bank adopted the criminal law standard for determining when an employee's acts would be attributed to an employer, and it was from this criminal law standard that the court drew the benefit-to-the-corporation requirement.  Congress's 1986 amendments to the FCA defined "knowingly" as including actual knowledge, deliberate ignorance, or reckless disregard.   See 31 U.S.C. § 3729(b), added by False Claims Amendment Act of 1986, Pub.L. 99-562 § 2(b), 100 Stat. 3153 (1986).  This amendment decreased the level of scienter required for a violation of the FCA and obviated the concerns about attributing the heightened level of intent of an employee to an employer that had prompted the Ridglea Bank decision.  As such, the decision is not persuasive.

     As to the Supreme Court's decision in Kolstad, the Supreme Court was concerned with remedies under Title VII.  In 1991, Congress provided for punitive damages under Title VII, but confined them to cases where the plaintiff could demonstrate "that the [defendant] engaged in a discriminatory practice or discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual.  42 U.S.C. § 1981a(b)(1).  The Supreme Court then examined the scope of the vicarious liability doctrine and noted that since Title VII's primary objective is to "motivat[e] employers to detect and deter Title VII violations," Kolstad, 1999 S. Ct. at 2129, the Supreme Court adopted the rule that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith

efforts to comply with Title VII. Id.

Despite AMI's arguments to the contrary, the holding in Kolstad with regard to Title VII actions does not translate to FCA actions. As the district court in Williams Building, supra, explained:

> The goals behind Title VII, however, are very different than the objective of the FCA, which seeks to encourage private citizen involvement in exposing those types of fraud that might result in financial loss of the government, thereby ensuring the recoupment of such losses.
> Because the Supreme Court's modification of the scope of employment rule was compelled by concerns unique to Title VII, this Court is not convinced that the Kolstad decision has any bearing upon the application of agency principles in the context of the FCA. Accordingly, the Court rejects [defendant's] invitation to extend the holding of Kolstad to the FCA.

Williams Building, 158 F. Supp. 2d at 1009 (citations omitted).

As to the decision in Southern Maryland, which relied in large part on Kolstad, the Court simply disagrees with its reasoning. The Court therefore joins the majority of cases which hold that a principle is vicariously liable whenever its agents act within the scope of their employment or with apparent authority regardless of the employer's knowledge or culpability. This holding is consistent with the purpose of the FCA to broadly protect the property of the government.

## V. Conclusion

Based on the stipulated facts, it is clear that the AMI employees, Gill, Charles Johnson, and Robert Johnson, acted within the scope of their authority and/or with apparent authority and with the requisite intent under the FCA. Their actions must be imputed to AMI, regardless of AMI's knowledge.

While the result may appear to be harsh given that AMI had no knowledge of the scheme, nevertheless it is a result called for by the FCA. It was the clear intent of

12

Congress when it amended the FCA in 1986 to enhance the protection of the public fisc. The stated purpose of the bill containing the amendments reads in relevant part:

> The purpose of S. 1562, the False Claims Reform Act, is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government.  While it may be difficult to estimate the exact magnitude of fraud in Federal programs and procurement, the recent proliferation of cases among some of the largest government contractors indicates the problem is severe.  This growing pervasiveness of fraud necessitates modernization of the Government's primary litigative tool for combating fraud the False Claims Act.  The main portions of the act have not been amended in any substantial respect since signed into law in 1863.  In order to make the statue a more useful tool against fraud in modern times, the Committee believed the statute should be amended in several significant respects.
> The proposed legislation seek not only to prevent the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward.  In the face of sophisticated and widespread fraud, the Committee believes only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding pubic funds....

S. Rep. No. 99-345, 99th Cong., 2nd Sess., 1-2 reprinted in 1986 U.S. Code Cong & Ad. News 5266-67.

Congress effectuated the statute's stated purpose in part by exposing a defendant to greater damages and eliminating the requirement that government prove a "specific intent to defraud" to establish liability.  The revision to the burden of proof was in response to what Congress viewed as "several restrictive court interpretations of the [FCA] .. which tend[ed] to thwart the effectiveness of the statute." Id. at 3-4.  Congress intended that the amendments provide "a more effective weapon against Government fraud." Id. at 4  Congress also noted that billions of dollars in public funds are lost through government fraud and that such fraud "erodes public confidence in the Government's ability to efficiently and effectively manage programs..." Id.  Congress

13

also made clear a business cannot hide behind the acts of its employees in avoiding liability, stating:

> Currently, in judicial districts observing an "actual knowledge" standard, the Government is unable to hold responsible those corporate officers to insulate themselves from knowledge of false claims submitted by lower-level subordinates.  This "ostrich-like" conduct which can occur in large corporations poses insurmountable difficulties for civil false claims recoveries.
> The committee is firm in its intention that the [FCA] not punish honest mistakes or incorrect claims submitted through mere negligence...[the FCA] should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.

Id. at 7.

As such, AMI must be held accountable for the actions of its employees.

The government shall submit a proposed form of judgment consistent with this decision on notice to AMI.

SO ORDERED.

   s/Avern Cohn  
AVERN COHN  
UNITED STATES DISTRICT JUDGE

Dated:  April 19, 2007

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, April 19, 2007, by electronic and/or ordinary mail.

   s/V. Sims for Julie Owens  
Case Manager, (313) 234-5160